1  Wendy Musell (State Bar No. 203507)
2  LAW OFFICES OF WENDY MUSELL
   180 Grand Ave. Suite 1300
3  Oakland, CA 94612
   Telephone: (510) 270-2252
4  Facsimile: (510) 228-1391
   wmusell@wendymuselllaw.com
5
   Attorney for Plaintiff
6  Jessica Bolton

7

8

                    **UNITED STATES DISTRICT COURT**
9
              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10

11  Jessica Bolton,                          )   Case No. _____
                                             )
12          Plaintiff,                        )   **PLAINTIFF'S COMPLAINT FOR**
                                             )   **DAMAGES AND DECLARATORY AND**
13          vs.                               )   **INJUNCTIVE RELIEF**
                                             )
14  California Department of Corrections and  )   **FEDERAL CLAIMS:**
    Rehabilitation; Gavin Newsom, Governor    )
15  of the State of California, Kathleen Allison, )  1. Illegal Intrusion on First Amendment Right
    Secretary California Department of         )   to Free Speech in Violation of 42 U.S.C. §1983
16  Corrections and Rehabilitation, Sergio     )
    Bustos, Gabriel Lopez, Jose Valencia,      )   2. Retaliation – Exercising Free Speech Monell
17  Allen Bowman, Mariah Alvarado;             )   Action-Based on Official Policy, Practice, or
    Emmanuel Ramirez; and DOES One             )   Custom in Violation of 42 U.S.C. §1983
18  through Fifty.                             )
                                             )   3. Retaliation – Exercising Free Speech Monell
19          Defendants.                        )   Action-Based on Act of Final
                                             )   Policymaker in Violation of 42 U.S.C. §1983
20                                             )
                                             )   4. Retaliation – Exercising Free Speech Monell
21                                             )   Action-Based on Ratification in Violation of 42
                                             )   U.S.C. §1983
22                                             )
                                             )   5. Retaliation – Exercising Free Speech Monell
23                                             )   Action-Based on Policy of Failure to Train or
                                             )   Supervise in Violation of 42 U.S.C. §1983
24                                             )
                                             )
25                                             )   **STATE CLAIMS:**
                                             )
26                                             )   6. Retaliation – California Labor Code §1102.5
                                             )
27                                             )   7. Ngligent Hiring, Supervision and Retention
                                             )
28                                             )   8. Intentional Infliction of Emotional Distress

8. Negligent Infliction of Emotional Distress

**DEMAND FOR JURY TRIAL**

Plaintiff Dr. Jessica Bolton alleges as follows:

## INTRODUCTION

1.     Plaintiff Dr. Jessica Bolton (hereinafter "Dr. Bolton" or Plaintiff) is a Mental Health Professional and Staff Psychologist at the Richard J. Donovan Correctional Facility (RJD), which is part of the Department of Corrections and Rehabilitation (CDCR). Plaintiff attended Kansas State University as an undergraduate psychology student and attended Pacific University for her Doctor of Psychology studies and completed her degree in 2010. Plaintiff has been employed at RJD since August 2015.

2.     Plaintiff brings this action pursuant to the laws of the State of California, California Labor Code 1102.5, Government Code Section 8547, et seq., and 42 U.S.C. §1983 for retaliation perpetuated by Defendants Newsom, Allison and California Department of Corrections and Rehabilitation, Sergio Bustos, Gabriel Lopez, Jose Valencia, Allen Bowman, and DOES 1 through 50 (hereinafter "Defendants"). Defendants retaliated against Plaintiff because Dr. Bolton exercised her First Amendment right of free speech pertaining to matters of public concern, including complaining about excessive force and illegal conduct in the workplace.

3.     Plaintiff alleges that Defendants, and other managing agents, retaliated against her for engaging in protected activity, including but not limited to, expressing her First Amendment Right of Free Speech and the Right to Petition the Government.

## JURISDICTION AND VENUE

4.     Dr. Bolton brings this action pursuant to the laws of California, California Labor Code, Government Code, and 42 U.S.C. §1983, thus this court has jurisdiction over the subject matter pursuant to 28 U.S.C. §1331.

5.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e), because decision making the unlawful practices alleged in this complaint occurred in the Northern District of California and Plaintiff was retaliated in part for testimony she gave regarding staff misconduct in *Armstrong v. Newsom,* Case No. Lopex, in violation of Docket Nos. 3059 and 3061.

**INTRADISTRICT ASSIGNMENT**

6.      Assignment of this action to the San Francisco Division of this Court is proper pursuant to Local Rule 3-2(c) because the events giving rise to this action occurred in the Northern District of California, *Armstrong v. Newsom,* Case No. 94-cv-02307 CW, in violation of Docket Nos. 3059 and 3061.

**PARTIES**

7.      Plaintiff Dr. Bolton is, and at all relevant times was, employed by Defendant CDCR.

8.      Defendant CDCR is a State Governmental entity responsible for operations of CDCR, including Plaintiff's work site operating under the laws of the State of California and the laws and regulations of the United States of America.

9.      Gavin Newsom is Governor of the State of California and Chief Executive of state government.  He is sued here in his official capacity.  As Governor he is obligated under state law to supervisor the official conduct of all executive and ministerial officers and to see that all offices are filled and their duties lawfully performed.  Defendant Newson has control over the monies allocated to California Department of Corrections by submitting a budget and by exercising his authority to veto or sign legislation appropriating funds for CDCR.  Defendant Newsom has the authority to appoint and remove subordinate Defendants named herein.  Defendant Newsom retains the ultimate state authority to ensure CDCR operates within the boundaries of federal and state law.

10.     Defendant Kathleen Allison is Secretary California Department of Corrections and Rehabilitation of the State of California and is sued herein in this capacity.  CDCR is responsible for the operation of the California state prison and parole system, and Plaintiff's workplace.

11.     Defendant Sergio Bustos at all times herein relevant is an individual and was an employee of CDCR, formerly holding the position of Custody Officer at Richard J. Donovan Correctional Facility (RJD).

12.     Defendant Gabriel Lopez at all times herein relevant is an individual and is a Custody Officer at RJD.

13.     Defendant Jose Valencia at all times herein relevant is an individual and is a Custody Officer at RJD.

14.     Defendant Allen Bowman at all times herein relevant is an individual and is a Custody

Officer at RJD.

15.     Defendant Emmanuel Ramirez at all times herein relevant is an individual and is a Custody Officer at RJD.

16.     Custodial Staff Defendants Bustos, Lopez, Valencia, Ramirez and Bowman as collectively referred to as "Defendant Custodial Staff."

17.     The true names or capacities, whether individual, corporate, associate or otherwise, of Defendants DOES One through Fifty, inclusive, are unknown to plaintiff and therefore Plaintiff sues these Defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and based thereon alleges, that each of these factiously named Defendants were responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by their conduct.

**RESPONDEAT SUPERIOR**

18.     All the described conduct, acts, and failures to act are attributed to agents and managing agents of Defendants Newsom, Allison and CDCR. Said acts, conduct and failures to act were within the scope of such agency and employment. At all times relevant herein, each participant was acting within the court and scope of his or her employment and agency. Further, at all relevant times each Defendant was acting in agreement, and with the endorsement, ratification, and consent of each of the other Defendants.

**RATIFICATION, ADOPTION AND AUTHORIZATION**

19.     Defendants and their managing agents, in both their individual and official capacities, ratified, adopted and authorized each of the Defendants and managing agents' illegal conduct. Defendants and their managing agents, in both their individual and official capacities, knew or should have known, that Defendant Custodial Staff and managing agents were engaging in illegal conduct and had been warned, informed, and given prior notice of the illegal conduct.

20.     It is well established that when an employer ratifies the tortious conduct of an employee, he or she becomes "liable for the employee's wrongful conduct as a joint participant." *Fretland v. County of Humboldt* (1999) 69 Cal. App. 4th 1478, 1489-1490. An employer who fails to discipline an employee after being informed of that employee's improper conduct can be deemed to have ratified that conduct. *Hart v. National Mortgage & land Co.* (1987) 189 Cal. App. 3d 1420, 1430; *Iverson v. Atlas Pacific*

*Engineering* (1983) 143 Cal. App. 3d 219, 228. According to the court in *Iverson*, supra, if an employer is informed that an employee has committed an intentional tort and nevertheless declines to "censure, criticize, suspend, or discharge" that employee, a claim can be made for ratification. *Id.*

21. "Ratification is the voluntary election by a person to adopt in some manner as his own, an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him. A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that he intended approving and adopting it.'" *Fretland*, supra 69 Cal. App. 4th 1491.

22. At all relevant times alleged herein, Defendants Newsom, Allison and CDCR and Defendant Custodial Staff, their managing agents, in both their individual and official capacities, had actual and constructive knowledge of managing agents' (Custody Officer Staff) illegal conduct and have endorsed, ratified, and encouraged managing agents' illegal behavior. Defendants Newsom, Allison CDCR, Defendant Custodial Staff and their managing agents, in both their individual and official capacities, failed to take any corrective action to protect employees and the public from Defendant Custodial Staff's illegal behavior, which has been ongoing for years.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

23. Dr. Bolton filed multiple informal whistleblower complaints starting from on or about October 2018, yet Defendants Newsom, Allison and CDCR failed to take any meaningful or proper action or investigate the complaints. Defendants Newsom, Allison and CDCR also delayed investigating Plaintiff's complaints of retaliation and harassment, intentionally dragging out and stalling investigation of Plaintiff's whistleblower complaint by intentionally stating that Plaintiff should file an "EEO" complaint and when she complied with CDCR's directive, delaying for complaints for one year until notifying Plaintiff her case did not meet EEO criteria and taking no other known action.

24. Plaintiff has exhausted all required administrative remedies.

## FACTS

### *Background on Senior Psychologist Dr. Jessica Bolton*

25. Plaintiff started as a Staff Psychologist with RJD in August 2015.

26.     Dr. Bolton experienced retaliation due to engaging in protected activity and reporting the use of excessive and illegal force by Custody Officer Staff on May 11, 2018.

27.     The improper governmental activity occurred on May 11, 2018. At approximately 9:20 a.m., Plaintiff heard loud yelling in the waiting room of the Mental Health Services Delivery System (MHSDS) building in Facility A. Due to the loud yelling, Plaintiff exited her office and observed an incident in which an inmate AB was standing in a combative stance and yelling. Plaintiff identifies the inmate as "AB," to protect his identity in this filing. Several Custody Officers had surrounded AB and Custody Officer Allen Bowman attempted to redirect AB to sit down. AB refused and continued to yell, which prompted Custody Officer Bowman to warn that he was going to apply Oleoresin Capsicum (OC) spray if AB did not follow directives. AB continued to yell, which resulted in Custody Officer Bowman applying OC spray towards AB. Throughout the incident, AB did not retaliate with any physical force or physical violence and/or physical movement towards the Custody Officer Staff. Once the OC spray was applied by Custody Officer Bowman, AB did not retaliate and went down to the floor. As AB was in the motion to get on the floor and crouching down to the floor, Custody Officer Sergio Bustos kicked AB in the face/head using extreme force. Custody Officer Bustos then stepped back and disengaged from AB. After such use of physical force by Custody Officer Bustos, AB continued to refrain from physical violence.

28.     Dr. Bolton's observation of this incident was immediately reported to her direct supervisor, Dr. Radhika Katyal, who instructed her to file an official CDCR Crime/Incident Report. Dr. Bolton did as she was instructed.

29.     On or about September 28, 2018, Plaintiff received a memorandum from CDCR to attend an administrative inquiry and interview that would be conducted by Special Agent Uriel Gamboa set for October 4, 2018. Plaintiff was informed that she was not the subject of the administrative inquiry but rather being interviewed as a witness to the events surrounding what occurred on May 11, 2018.

30.     On or about October 4, 2018, the administrative inquiry and interview with Special Agent Gamboa was held.  Dr. Bolton provided testimony at this administrative inquiry. Also attending were Ron Bremen, a Special Assistant Inspector General with the Office of the Inspector General, along with Attorney Beverly Fisher with the Office of Legal Affairs. This was an official inquiry by Defendant CDCR involving Office of Internal Affairs (Case No. S-RJD-198-18-A) regarding alleged misconduct

by Custody Officer Sergio Bustos in a use of force incident that occurred on May 11, 2018. (Log No. RJD-AYD-18-05-0283).

31.     During the interview, Dr. Bolton stated that she was asked to participate in the IA Investigation because "I made an allegation of staff misconduct" regarding excessive force against Defendant Bustos. Plaintiff witnessed Defendant Bowman pull out his alarm, "pressed the alarm, and then pulled out the OC spray and sprayed him (AB) in the face – and chest." Consequently, AB became quiet, did not retaliate, and crouched down to the floor. Plaintiff highlighted how she saw Custody Officer Bustos strike AB "with extreme force" in the face using his right foot, resulting in AB laying on the floor, trying to cover his face and being in a "self-preservation stance." Dr. Bolton further notes how Defendant Bustos disengaged afterwards in a "very cool and calm and collected manner."

32.     Dr. Bolton also reported that in late May or early June of 2018, a colleague, and a Mental Health Clinician who no longer works at RJD, notified Plaintiff that Custody Officer Bustos had approached her and asked if she had heard "anything about somebody getting kicked?" It was clear he was trying to see who had reported his conduct and improperly influence witnesses to his unlawful conduct.  Moreover, Plaintiff mentioned how shortly after the incident of May 11, 2018, Custody Officer Staff, identified herein, started treating her differently, including but not limited to, isolating Plaintiff, and impacting her ability to provide patient care. Such retaliation also made it difficult for Plaintiff to do her job as Dr. Bolton has to see her patients in confidential areas and in a finite period. This led Plaintiff to believe that Defendant Custodial Staff were aware of the information in her incident report, including that Plaintiff provided information about the excessive use of force. Plaintiff experienced increased hostility and attitude from other Custody Officer Staff in general. Plaintiff also learned that she was being monitored closely by all officers who were recording her actions in the Housing Unit Logbook. Near the end of the interview, Plaintiff also brought up how in approximately September of 2018, AB approached Plaintiff and identified himself as the inmate who was kicked. In such an interaction, AB indicated that he believed Dr. Bolton was being treated negatively after observing and reporting what Plaintiff witnessed on May 11, 2018. After identifying himself to Plaintiff and Plaintiff making it clear that she could not discuss the matter with him, AB said "I just want to apologize if this has caused you any undue stress at work with your colleagues." Plaintiff inferred from his communication that he was aware of the treatment Plaintiff was receiving. To further illustrate how Plaintiff learned she was being watched and

her movements documented within RJD, Plaintiff was asked about her interaction with AB by investigators during the interview.

33.     Following Plaintiff's reporting of the excessive use of force by Custody Officer Bustos on May 11, 2018, Plaintiff experienced retaliation from Defendant Custodial Staff, identified herein, on an ongoing basis. For instance, after the incident of May 11, 2018, Dr. Bolton noticed immediately that the hostility increased significantly, and Custody Officers Ramirez, Valencia, Bowman, Bustos along with Custody Officers with whom Plaintiff thought she had good rapport with, stopped talking to her. On an ongoing basis and after the incident, Plaintiff would ask for assistance from Custody Officer Staff, including Defendant Custodial Staff, that fell within their job duties, and no one would respond. This made it more difficult to perform job duties for Plaintiff and less safe for her in the workplace. Also, on an ongoing basis and after the incident of May 11, 2018, Defendant Custodial Staff and others whom Plaintiff cannot identify, would fail to bring Dr. Bolton's patients to the clinic, and they would claim that the patients refused. When Plaintiff would go to the Housing Unit to see patients, Plaintiff was repeatedly told by various patients that they had not even been informed about Plaintiff's requests to see them in the clinic. This also meant that patients were not getting necessary medical care and were not receiving medical care in a confidential setting as required by policy and the federal district court in *Armstrong v. Newsom*.  It also meant that Plaintiff cannot effectively perform her job duties.

34.     At times when there would be a lack of cooperation from Custody Officer Staff, specifically Defendant Custodial Staff among others, Plaintiff had to secure the assistance of the Housing Unit Custody Staff to assist Plaintiff with patients so patients could attend their clinic sessions for mental health services. Such occurrences happened weekly. When Plaintiff had to secure the help of Housing Unit Custody Staff due to Defendant Custodial Staff and others refusing to help due to retaliation for Plaintiff's reporting of the May 11, 2018 abuse of force, Plaintiff reported it to the yard supervisor, Dr. Katyal. Plaintiff reported such incidents to Dr. Katyal, in the following fashion: in writing, in medical charts, and verbally.

35.     Plaintiff also observed another colleague and staff member, was treated similarly by Custody Officer Staff and retaliated against after the colleague reported unlawful conduct in the workplace.  Plaintiff overheard Custody Officer Staff, specifically Custody Officer Ramirez, call her a "snitch" when she reported such problems to the colleague's chain of command.  Custody Officer

Ramirez failed to cooperate with Plaintiff including when it came to patient access and retrieval. Moreover, the colleague received a text message from Custody Officer Ramirez, once they had stopped coming into work due to the retaliatory behavior of Custody Officer Staff, which said he and other Custody Officer Staff had destroyed private property belonging to the colleague. The colleague asked Plaintiff if Plaintiff could retrieve the personal belongings, but once Plaintiff was in the colleagues' office, the personal property was missing which led Plaintiff to believe that Custody Officer Staff had indeed destroyed her colleagues' personal items and property.

36.     On or about October 25, 2018, Plaintiff met with Dr. Katyal regarding experiencing retaliation from Custody Officer Staff due to reporting the incident on May 11, 2018. During this meeting, Plaintiff stated that she noticed immediately that the hostility had increased significantly since Plaintiff's reporting of the excessive force incident of May 11, 2018; Defendant Custodial Staff and others unknown to Plaintiff, would fail to bring Plaintiff's patients to the clinic, and they would claim that the patients had refused. Moreover, when Plaintiff would go to the Housing Unit to see patients, Plaintiff was repeatedly told by various patients that they had not even been informed about Plaintiff's requests to see them in the clinic. Dr. Katyal recommended that Plaintiff document any adverse actions. On or about October 26, 2018, Dr. Katyal, in an e-mail correspondence, recommended along with Dr. Sonia Bahro, Chief of Psychology, that Plaintiff contact the Equal Employment Opportunity (EEO) to file a complaint about the retaliation.

37.     On or about October 28, 2018, Plaintiff submitted a confidential complaint to the California State Auditor alleging that Plaintiff had observed improper governmental activity in the form of Custody Officer Busto's use of excessive force during the May 11, 2018 incident and further, where after reporting the incident, Plaintiff experienced retaliation for making those reports and participating in the internal investigation related thereto.

38.     In mid to late October 2018, Plaintiff filed an EEO complaint of retaliation with the CDCR, as directed by CDCR. Plaintiff's report stated that she had observed the excessive force used by Custody Officer Bustos on May 11, 2018, and Plaintiff had filed a report of incident with her supervisor and had participated in the investigation of that incident by attending multiple interviews. In the report, Plaintiff stated that she experienced retaliation for that protected activity and that the retaliation included: efforts by Custody Officer Bustos to determine who had filed the complaint, hostility and a lack of

cooperation from Custody Officer Staff including Ramirez, Valencia, Bowman, and Bustos, and false allegations lodged against Plaintiff.

39.     In addition to filing an EEO complaint, Plaintiff tried to submit a whistleblower complaint to the California State Auditor's Officer containing the same information. Plaintiff submitted this on or about November 11, 2018.

40.     On or about October 26, 2018, Plaintiff informed her chain of command that she had filed an EEO complaint as directed.

41.     On or about October 29, 2018, Dr. Bolton was notified through e-mail correspondence sent by her direct supervisor, Dr. Katyal, that Custody Officer Staff, including Custody Officer Jose Valencia, had notified Dr. Katyal about an alleged incident on or about October 24, 2018; the e-mail correspondence also included Dr. Bahro and Dr. Kristin Francis. The information conveyed to Dr. Katyal was given to her by Custody Officer Staff from MHSDS Facility A, the same where the May 11, 2018 use of force incident occurred. Dr. Katyal was told that Plaintiff had allegedly failed to arrive at 12:00 PM, and instead arrived at 12:30 PM on October 24, 2018. According to what Dr. Katyal was told by Custody Officer Staff, Plaintiff was not in her office and "nowhere to be found." Moreover, it was alleged that a colleague and student, Ms. Sophie Schmell, was looking for Plaintiff to discuss a clinical issue earlier that day. The information given to Dr. Katyal went on to allege that once Ms. Schmell and Plaintiff made contact in the waiting area/front doors of the MHSDS building, Plaintiff "reprimanded Ms. Schmell" for failing to contact Plaintiff sooner regarding the clinical matter. The Custody Officer Staff communicated to Dr. Katyal "that they were concerned that Dr. Bolton's feedback should have been given to Ms. Schmell not only in private, but also in a more supportive and understanding manner given that Ms. Schmell is early in her career and still learning." Dr. Katyal, in her e-mail correspondence, notified Plaintiff that she had requested the Custody Officer Staff to put their concerns into writing, but they claimed they "were hesitant to do so" and never did. These allegations were elevated to administration prior to even being discussed with Plaintiff.  On information and belief Plaintiff believes Custody Officers Bustos, Bowman, Ramirez, Lopez, and Valencia were involved in conveying these false allegations.

42.     On or about October 30, 2018, Plaintiff responded to Dr. Katyal to point out the untruthfulness and inaccuracies of such allegations made by those Custody Officer Staff. Plaintiff made

it clear that Plaintiff was on time and onsite and provided a list of duties Plaintiff performed and the witnesses who were privy of Plaintiff's presence at the time. Such allegations against Plaintiff were false and never happened and further illustrate the retaliation Plaintiff faced due to engaging in protected activity by reporting the excessive use of force and illegal conduct on May 11, 2018.

43.     On or about November 5, 2018, Plaintiff came into her office and observed that a personal item that had been removed from her office desk drawer and destroyed. The destroyed personal item was left on the floor of Plaintiff's office. Within the same period of this incident, it was established that someone had entered Plaintiff's office and had failed to log out of the computer and left a document in the printer. The person who had been in Plaintiff's office, based on the computer login information and printed document related to custody business, was Custody Officer Gabriel Lopez. This was later confirmed by looking at who was working during that time. Plaintiff's office was assigned as a mental health designated office. Plaintiff was informed by Dr. Katyal that other disciplines (such as correctional officers) are not authorized to use these offices, which Plaintiff believes is also because their work comes under HIPAA given that there is patient medical information. Therefore, Mental Health staff offices are locked over the weekend as well. The Assistant Deputy who Plaintiff had reported the retaliatory conduct to never followed up the incident with Plaintiff or took any other action that Plaintiff is aware of in response to her report.

44.     On or about November 5, 2018, Plaintiff alerted Dr. Greenwald, along with Dr. Katyal and Dr. Bahro, through e-mail correspondence, about two specific matters.  Plaintiff provided proof regarding the false allegations that were made against Plaintiff by Custody Officer Staff for October 24, 2018 incident about being late and "reprimanding" Ms. Schmell. Plaintiff also notified them that earlier that day, on November 5, 2018, Plaintiff discovered that personal property had been removed from her desk and destroyed; and that Plaintiff had reason to believe that Custody Officer Gabriel Lopez was involved in that incident.

45.     On or about November 5, 2018, Plaintiff also wrote a memorandum directed at Dr. Katyal and Dr. Bahro highlighting the incident in Plaintiff's office and what was evidence of unprofessionalism, vandalism, and retaliation. It was confirmed that Custody Officer Lopez had last worked on Saturday, November 3, 2018, had been logged into the computer and failed to correctly log out.

46.     On or about November 16, 2018, Dr. Bahro sent Plaintiff a memorandum that stated:

"Effective Monday, December 10, 2018, you [Dr. Bolton] will be reassigned to the EOP Program located on Facility E. Your supervisor will be Dr. [Mark] Lukasik, Senior Psychologist Supervisor." This reassignment was in retaliation to Plaintiff's participation in the above noted protected activities. Dr. Bahro and Plaintiff discussed this reassignment over the telephone before Plaintiff was officially given the memorandum. This reassignment came as a surprise to Plaintiff and had never been discussed nor brought up even prior to the May 11, 2018 incident. Plaintiff's code of ethics that she is subject to as a psychologist include that she not abandon her patients and their treatment. During the telephone conversation, Plaintiff asked for clarifications from Dr. Bahro about the reason for the reassignment, and Plaintiff was informed that it was due to institutional need and "for reasons I cannot disclose." Such a reassignment had negative implications on Plaintiff's work as Plaintiff had spent extensive time and effort developing rapport with her patients and helping them; such a reassignment cut into the continuity of patient care and disrupted work for Plaintiff. This also required a great deal of research, transition period, and case review regarding new patients.

47.     On or about November 19, 2018, multiple inmates who were assigned to Dr. Bolton for mental health treatment in a therapeutic group reported that a fellow inmate and patient of Dr. Bolton had been subjected to excessive force the preceding day. The inmate will be identified by the initials BB in this complaint to protect the inmate's identity.  BB was reportedly agitated/angry with custody staff, raised his voice, and crossed him arms in the day room on the opposite side of the custody podium from custody, all of which was reportedly in reaction to having the flashlight pointed at him. A custody officer allegedly began to argue with BB, threatened to spray him, and reached for his spray, to which BB stated, "Go ahead and spray me." The tower officer then pressed the alarm and several officers came running. The reporting inmates alleged that BB was not told to get down or asked to put his hands behind his back, and the reporting inmates denied that BB was threatening or physically aggressive prior to use of force being utilized. BB was reportedly tackled from behind by an incoming officer who allegedly began punching BB about the body and face, and several officers surrounded and began kicking BB. BB's arms and legs were placed in restraint and BB was then allegedly sprayed was allegedly applied while BB was face down on the ground. According to the reporting inmates, BB was bleeding on the day room floor and moved to the rotunda after he was already in restraints where he

was allegedly beaten further until he lost consciousness and continued to bleed. Several other inmates reported being witness to this incident—including BB losing consciousness. The inmate is a member of the *Armstrong* and *Coleman v. Newsom* class actions and had been cooperating with counsel for the class. Plaintiff understood that this was a message to her and inmates of the power over them and the consequences for making complaints of violations of law against Defendants. Plaintiff reported this incident to her supervisory chain but is unaware of any investigation or other actions taken as a result by Defendants.

48. On or about February 6, 2019, Plaintiff had her second follow up interview with Special Agent Gamboa regarding the incident from May 11, 2018. It is important to note that at times during the interview it appeared that it was being conducted in a way to attempt to discredit Plaintiff. Nevertheless, in this interview, Plaintiff provided additional information about the harassment and retaliation experienced by Plaintiff and fellow colleagues at the hands of Custody Officer Staff. Plaintiff stated during this interview that Plaintiff was aware of another witness, who informed Plaintiff that she was told by Custody Officer Staff that she did not have a duty to report what she observed about the May 11, 2018 incident because she had indicated she had a partial view of the incident. Plaintiff also stated that she previously mentioned this witness to her supervisor that this colleague had witnessed the May 11, 2018 incident of excessive force. Plaintiff also discussed how a colleague was harassed by Custody Officer Staff to the point where they missed a lot of work and eventually left working for RJD. The harassment the colleague suffered from Custody Officer Staff, included refusing to retrieve patients from their cells when they were supposed to receive mental health treatment, being falsely and cruelly informed that patients were dead when the colleague would come into work and ask that the patient be brought to their appointed mental health treatment time as a reason for custodial staff to not bring patients to their mental health treatment appointment, and Custody Officer Staff making comments that the colleague's patients were probably doing drugs and other pejorative statements, all in front of the colleague and inmate patients. Further, the colleague was being stalked by an inmate who was delusional. Custodial officers falsely informed the colleague that the delusional inmate was found hiding in her office waiting for her. This was false and done for the purpose of increasing the colleague's fear for her safety and the power that custodial staff had over her safety in the workplace. It was also meant to demonstrate to Plaintiff and the colleague how easily their safety could be compromised in the prison environment in which they

worked by custodial staff. It was intended to enforce Plaintiff and her colleague's silence into not reporting any further unlawful conduct.   Plaintiff reported the retaliation against the colleague and the failure of CDCR to act to address the retaliation. No action was taken that Plaintiff was aware of in response to her whistleblower reports. The open and notorious conduct of the Defendant Custodial Staff served as to discourage Plaintiff and other employees from engaging in further protected activity.

49.     Plaintiff also reported that Custody Officer Bustos, since the May 11, 2018 incident, had disparaged Plaintiff, and made it clear that mental health professionals do not belong at RJD and that there is no need to have people like Plaintiff at RJD. Plaintiff also reported that she was aware of other non-custody personnel staff and mental health professionals who had been discouraged by Custody Staff from reporting the abuse of force incident on May 11, 2018. Despite Plaintiff raising this unlawful conduct, no action was taken as a result.

50.     Defendant Custody Officer Bustos conveyed his retaliatory conduct towards Plaintiff in an open and notorious manner in the workplace. For instance, since Plaintiff's office was near the Custody Officer Staff office, Plaintiff often overheard Custody Officer Bustos make comments like "I'm tired of these psych doctors' bullshit" or "I'm not your fucking secretary," which was about add-on appointments for mental health care that would happen frequently. Custody Officer Bustos made remarks about how he did not think mental health professionals belonged at RJD. Such comments were made in front of many staff, including Plaintiff's supervisors, during a Partnership Huddle, which are designed to improve relations between disciplines and staff.

51.     On or about October 22, 2019, Plaintiff was ordered to be present in front of an Administrative Law Judge (Case: 19-1053) for the State Personnel Board, regarding the May 11, 2018 incident, set for December 11-13, 2019. Plaintiff appeared, as required, and offered testimony related thereto. Two days prior to this, Plaintiff was informed that Plaintiff's whistleblower complaint, which had been improperly processed as an EEO complaint, had been rejected by CDCR.

52.     On or about December 9, 2019, the Chief Deputy Warden, notified Plaintiff through e-mail correspondence that Plaintiff's case had not met EEO criteria would thus be handled by "ISU for potential staff misconduct." This was after a prolonged period where Plaintiff had to go through multiple CDCR staff to get answers. Plaintiff also attempted to get a copy of the EEO report from the November 2018 EEO interview, but was not successful; it was never provided to Plaintiff. While Defendant CDCR

understood Plaintiff had not raised EEO issues (but had reported whistleblower retaliation), it nonetheless processed Plaintiff's complaints as an EEO complaint. On November 18, 2019, Plaintiff received a letter from the RJD EEO Coordinator, in which she stated that Plaintiff's complaint of retaliation for reporting excessive force and subsequent retaliation did not "meet the EEO criteria." CDCR took no action for approximately over a year and a half to complete this process and never processed a whistleblower complaint. Records submitted by CDCR to the State Personnel Board in May 2021 revealed no action whatever had been taken by CDCR in response to the EEO complaint that CDCR had directed Plaintiff to complete.

53.     On or about the morning of April 9, 2020, Plaintiff's supervisor on Facility E, presented Plaintiff with a handwritten note of four names who were all Plaintiff's patients. Plaintiff's supervisor reported that Sgt. Michael Poladian had provided him with the list of patient names but suspected it had been drafted by a Custody Officer from the Housing Unit named Custody Officer Alvarado. As background information, Custody Officer Alvarado was moved away from Facility E due to disciplinary reasons and had also engaged in retaliatory behavior toward one of her colleagues. The list of patient names that were provided to Plaintiff's supervisor were given under the guise of concern, specifically that they were being seen (by mental health professionals) in a non-confidential area. However, other clinicians were also seeing their patients in the non-confidential area since it was based on a new directive sent out on or about March 24, 2020, when RJD started modified programming due to COVID-19 precautions. There was no additional explanation as to why Plaintiff's patients and Plaintiff were singled out from all other mental health clinicians. There was no additional explanation as to why Custody Officer Staff were supposedly not aware of this directive re COVID precautions, or why they did not raise similar concerns for other patients and clinicians. Plaintiff's supervisor expressed that he thought this raised concern and was out of the ordinary. This was another attempt to get Plaintiff disciplined or to falsely claim Plaintiff have violated policies and procedures or patients' rights by Defendants.

54.     The use of excessive force witnessed by Plaintiff on May 11, 2018 and the subsequent retaliation and harassment Plaintiff has endured and continues to experience from Defendant Custodial Staff is further illustration of the persistent and ongoing problems at CDCR and RJD, which have also been thoroughly documented and highlighted in the lawsuits of *Armstrong et al., v. Gavin Newsom et al.* As evidenced and documented for years by the Plaintiffs in the *Armstrong* matter, specifically their

Notice of Motion and Motion to Stop Defendants from Assaulting, Abusing, and Retaliating Against People with Disabilities at R.J. Donovan Correctional Facility, Correctional officers/Custody Officers "are assaulting and terrorizing incarcerated people with disabilities at R.J. Donovan Correctional Facility (RJD). As described in the fifty-four declarations…officers are throwing people out of wheelchairs, punching deaf people when they cannot hear spoken orders, beating people with disabilities who request help carrying heavy packages, closing cell doors on people who use walkers and wheelchairs, and attacking suicidal people when they ask for mental health care. Witnesses report at least one and possibly two instances where staff used force in a way that contributed to the deaths of incarcerated people."

55.     Within the fifty-four declarations, there are examples of inmates suffering excessive force where Custody Officer Staff have targeted the neck and head region thus showing a pattern that the incident of May 11, 2018 is part of a bigger and ongoing problem of Staff and Custody Officer Staff misconduct; incidents include details such as kicking, slamming, and stomping on a person's head. Moreover, "officers assault people who are restrained and not resisting or who they have already knocked unconscious. Those who complain about mistreatment become the officers' next victims or receive false disciplinary write-ups." Declarations also give details on how inmates who filed complaints or spoke about misconduct were targeted, threatened, and/or attacked and Custody Officer Staff inquiring about the status of complaints against them directly from the Complainant. Dr. Bolton was also deposed within the *Armstrong* matter in February 2020 and was not represented by CDCR. The Counsels for Plaintiffs in the Armstrong matter further summarized Dr. Bolton's experiences as "officers have even retaliated against a CDCR psychologist who, following policy, reported misconduct perpetrated by custody staff."

56.     Since 2016, Plaintiffs' Counsel in the Armstrong matter have notified CDCR and RJD of more than fifty discrete and specific allegations of misconduct at RJD in advocacy letters and Armstrong monitoring tour reports. *Id.* at 7. In December 2018, as a response to reports by Plaintiff's Counsel in the *Armstrong* matter and CDCR's own auditors in the Office of Audit and Court Compliance (OACC) after a joint *Armstrong* monitoring audit at RJD, CDCR sent a 'strike team' of investigators to conduct interviews with more than one hundred incarcerated people at Facility C at RJD. At 13. Investigators heard repeatedly "that officers were targeting people with disabilities with violence, hiring incarcerated people to assault other incarcerated people" and just as with Dr. Bolton in this matter, how officers were "retaliating against anyone who dared speak up, and engaging in 'gang-like' activity." The December

2018 interviews also shed further light on the degree of retaliation; investigators found that "custody staff actively retaliat[e] against inmates for filing appeals or staff complaints or requesting assistance with safety concerns."

57.     Associate Warden Bishop, who led the strike team wrote a report (Bishop Report) based on his assessment of the interviews and made several recommendations in 2018, which have also been discussed in the orders granted by Judge Claudia Wilken in September 2020. Recommendations included: that the actionable allegations of forty-eight inmates be investigated promptly; live-feed cameras be installed in all areas of limited or obstructed visibility; CDCR conduct a comprehensive review and investigation of staff gang activity on Facility C by trained gang investigation staff; and CDCR increase managerial presence on Facility C during all hours. Even the Defendants in the *Armstrong* matter acknowledged that the Bishop Report "formally recognized serious problems with aspects of" RJD operations. However, as of the date of the orders granted by Judge Claudia Wilken, CDCR had not installed additional cameras; had not devoted additional resources to investigate or address gang-like behavior among RJD staff; or increased managerial presence on Facility C or elsewhere at RJD.

58.     The Chief Ombudsman for CDCR, after the interviews of the December 2018 strike team were concluded wrote in an email to CDCR's Director of the Division of Adult Institutions (DAI): "[W]hat we heard was overwhelming accusations of abuse by the Officers with Sgt's and Lt's looking in the other direction. I have never heard accusations like these in all my years. I would strongly suggest placing a strike team on this yard immediately. Many of the inmates have expressed fear of what will happen to them tomorrow when the [strike team] is not there…This is a very serious situation and needs immediate attention. If there is any means of installing cameras immediately I would strongly suggest it, at least in the blind spots and the boor door by the gym. A review of the appeal process, RVR's and staff complaints off that yard also needs to take place ASAP." Such documentation that has been gathered throughout the *Armstrong* matter further illustrate and support Dr. Bolton's contention that there exists a culture of fear, reprisal, retaliation, coverup, and excessive use of force at RJD.

59.     As of the filing of the Motion to Stop Defendants from Assaulting, Abusing, and Retaliating Against People with Disabilities at R.J. Donovan Correctional Facility, Plaintiffs in the *Armstrong* matter have consistently made it clear that Newsom, Allison ad CDCR's response have been shockingly inadequate: since 2017, CDCR has only issued terminations to five RJD officers for engaging

in misconduct against inmates; despite evidence of criminal assaults, not a single officer has been criminally charged for hurting an incarcerated person; CDCR still has not completed investigations into the allegations raised during the December 2018 strike team interviews; despite the strike team recommendation that cameras be installed throughout RJD and agreement from all stakeholders that cameras are critical for reducing staff misconduct, CDCR has not installed any additional cameras; CDCR has no functioning system to investigate or track allegations of misconduct and no early warning system to detect problems. Overall, within the context of the *Armstrong* matter, there are fifty-four declarations which describe well over one hundred discrete instances of abuse occurring since 2016. Defendants have been aware of Custody Officer Staff misconduct, use of excessive force, retaliation, and harassment for years and have failed to properly address them. For instance, the Bishop Report stated that sixty-six inmates out of 102 who were interviewed (72%) responded that "they expected a negative outcome if they reported staff misconduct or the use of excessive force."

60.     Federal Judge Claudia Wilken, in the *Armstrong* matter, granted an order in September 2020 for additional remedial measures to address the crisis at CDCR and RJD and part of the *Armstrong* Remedial Plan has been the need for CDCR and RJD to install cameras: "Within ninety days of the finalization of the RJD Remedial Plan, CDCR shall install operational surveillance cameras that cover all areas of RJD to which class members have access, including, but not limited to, all exercise yards, housing units, sally-ports, dining halls, program areas, and gyms. Within sixty days of the finalization of the RJD Remedial Plan, CDCR must being using body-worn cameras for all correctional officers at RJD who may have any interactions with class members. The RJD Remedial Plan shall describe the steps that Defendants will take to achieve these deadlines."

61.     The orders that have been granted by Judge Claudia Wilken, stemming from the Armstrong matter, also highlight the need for Newsom, Allison and CDCR to reform staff complaints, investigations, and discipline processes along with training to cover discussions of reporting requirements, whistleblowing, non-retaliation, and treatment of incarcerated people with disabilities. Such remedial measures, although focused on the rights of class members and/or inmates, still seek to ensure CDCR completes unbiased and comprehensive investigations, incorporates effective mechanisms for oversight over all staff complaints, and has use-of-force reviews. Judge Wilken, as part of the order granting additional remedial measures, also emphasized the need for CDCR to also develop a plan to

modify its policies to monitor and control the use of pepper spray by RJD staff with respect to class members more effectively. These orders, granted by Judge Claudia Wilken on September 8, 2020 illustrate, how Newsom, Allison and CDCR have failed to respond to such problems properly and promptly.

62.     The *Armstrong* matter, with years of documented excessive use of force, culture of fear, retaliation, reprisal, harassment, and overall staff misconduct, establishes a foundation that illustrates the systemic problems at CDCR and RJD. As Plaintiff's Counsel and expert in the Armstrong matter stated: "to date, CDCR appears incapable of changing the staff culture – a culture more representative of gang behavior than professional corrections staff – despite having a wealth of information from credible sources about the nature and depth of the problem of staff misconduct." Dr. Bolton has experienced since reporting the excessive use of force on May 11, 2018 and the subsequent retaliation and harassment is thus not isolated, unheard of, or uncommon.

63.     On or about February 24, 2021, an inmate who was treated by Plaintiff reported suicidal ideation, and safety concerns was interviewed by custodial staff.  The custodial staff turned off their cameras and stated that they did not care what the inmate was going through and did not care what the inmate's clinician [Dr. Bolton] said. The custodial staff further informed the inmate to not listen to his clinician [Dr. Bolton].  On another recent occasion, a Sergeant informed an inmate patient to not share information with Dr. Bolton and instead to talk directly with custodial staff.  This is a continuing pattern of retaliation to the present date towards Plaintiff and had the effect of discouraging inmates from receiving critically necessary mental health care.

64.     Plaintiff has experienced ongoing retaliation for her repeated reports of unlawful conduct, as set forth above.

65.     Had Defendants Newsom, Allison and CDCR properly responded and addressed such volume of reports of physical and verbal staff misconduct, Dr. Bolton would not be yet another victim and target of retaliation and harassment at the hands of Defendant Custodial Staff.

**FIRST CLAIM FOR RELIEF**
**Illegal Intrusion on First Amendment Right to Free Speech in Violation of 42 U.S.C. §1983**
**(Against all Defendants)**

66.     Plaintiff incorporates by reference herein each preceding paragraph of the complaint as though set forth herein full.

67.     Dr. Bolton brings this claim under federal statute 42 U.S.C. §1983, which provides that any person or persons, who under color of law, deprives another of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the injured party.

68.     The First Amendment of the United Sates Constitution states: "Congress shall make no law abridging the freedom of speech, or the press." The First Amendment has been interpreted to apply to all government organizations in the United States. It applies to state and local governments through operation of the Fourteenth Amendment Due Process Clause, which incorporates the free speech protection of the First Amendment.

69.     Public employees have the right not to have the government restrict their speech based on the speech's viewpoint. Such restrictions are rarely permitted.[1] The rationale for prohibiting suppression of public employee speech pertaining to matters of public interest is to protect employees from their superiors who may exercise their authority because the superior disagrees with the content of the employee's speech.[2] The government must meet a high standard for restricting speech in a public forum. State action designed to retaliate against, and chill free speech strikes at the very heart of the First Amendment.

70.     The United States Supreme Court has developed a test to determine when First Amendment protection attaches to a public employee's speech. A public employee's speech is protected if, (1) The speech is a matter of "public concern"; (2) the employee spoke as a private citizen and not a public employee (i.e., speech is not pursuant to "official duties"); and (3) the employee's speech interest outweighs the agency's interest in efficiency and effectiveness. *Eng v. Cooley* 552 F.3d 1062, 1070-71 (9th Cir. 2009).

71.     Defendants deprived Dr. Bolton of her rights under the First Amendment to the United States Constitution when they took adverse employment action that included harassment, and retaliation

---

[1]     *Rosenberger v. Rector and Visitors of the University of Virginia*, 515, U.S. 819, 829 (1995).

[2]     "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employee's speech." Justice Thurgood Marshall in *Rankin v. McPherson,* 483 U.S. 378 (1987).

due to Dr. Bolton having voiced concerns about excessive force and unlawful conduct and employment practices.

72.     Defendants took adverse employment action against Plaintiff as herein alleged. These adverse employment actions were such that a reasonable employee would have found them to be materially adverse and that they would have dissuaded a reasonable employee of Defendants from engaging in this protected speech activity.

73.     Plaintiff's speech was a substantial or motivating factor for the adverse employment actions taken against her by Defendants.

74.     Defendants' intentional and negligent actions and failures, including but not limited to, training and hiring practices along with failure to investigate and remedy unlawful activity as alleged above as to Plaintiff constitute a policy, pattern, practice, and/or custom of violations of the Civil Rights Laws of the United States, 42 U.S.C. §1983. Defendants, while acting under color of state authority and law, deprived Plaintiff of her federal and statutory right to free speech pursuant to the First Amendment.

75.     The conduct of Defendants, in their official capacities, at all times relevant and set forth above, constitutes violations under color of law of Plaintiff's rights, privileges, and immunities guaranteed her by the First Amendment of the United States Constitution.

76.     Defendants Newson, Allison and CDCR further violated Civil Rights Laws of the United States, 42 U.S.C. §1983 when they failed to take steps to prevent Defendant Custody Officer Staff from taking these illegal actions against Dr. Bolton when it had notice.

77.     Defendants Newsom, Allison and CDCR knew that its agents, employees, and/or Defendant Custody Officer Staff were engaging in these acts and knew or reasonably should have known that its agents, employees, and/or Custody Officer Staff conduct would deprive Plaintiff of those rights and Defendants Newsom, Allison and CDCR failed to act to prevent its agents, employees and/or Defendant Custody Officer Staff from engaging in such conduct.

78.     Defendants' actions have caused and continue to cause Dr. Bolton substantial loss of reputation and professional injury, loss of promotional opportunities and other employment benefits, attorneys' fees, medical expenses, humiliation, embarrassment, and anguish, all to her damage in an amount according to proof.

79.     Defendants' acts, as alleged herein, were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure Dr. Bolton and to cause her mental anguish, anxiety, and distress. Defendants' acts were done in conscious disregard of the risk of severe emotional harm to Dr. Bolton and with the intent to injure, constituting oppression, fraud, and malice, entitling Dr. Bolton to punitive damages against the individual Defendant Custodial Staff only.

80.     Wherefore, Plaintiff prays for judgement as more fully set forth below.

**SECOND CLAIM FOR RELIEF**
**Retaliation for Exercising First Amendment Free Speech Monell Action-Based on Official Policy, Practice, or Custom in Violation of 42 U.S.C. §1983**
**(Against Defendant Newsom, Allison, CDCR, Does 1-50)**

81.     Plaintiff incorporates by reference herein each and every paragraph of the complaint as though set forth herein full.

82.     Dr. Bolton brings this claim under federal statute 42 U.S.C. §1983, which provides that any person or persons, who under color of law, deprives another of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the injured party.

83.     To state a claim of retaliation under §1983, a Plaintiff must allege: (1) that her conduct was protected by the Constitution, and (2) that the protected conduct was a substantial or motivating factor in any retaliatory acts taken by the state actor Defendants. *Pankey v. City of Concord*, 6-CV-03737-JCS, 2008 WL 793873, at 9 (N.D. Cal. Mar. 24. 2008) (citing *Berry v. Atkins*, 93-CV-20473-WAI, 1995 WL 691869, at 3 (N.D. Cal. Nov. 15, 1995)).

84.     Under the First Amendment, a public employee has a qualified right to speak on matters of public concern. To prove the defendant deprived the Plaintiff of this First Amendment right, the Plaintiff must prove the following additional elements by a preponderance of the evidence: (1) the Plaintiff spoke as a private citizen and not as a part of her official duties as a public employee; (2) the Defendant took an adverse employment action against Plaintiff; and (3) the Plaintiff's speech was a substantial or motivating factor for the adverse employment action.

85.     An action is an adverse employment action if a reasonable employee would have found the action materially adverse, which means it might have dissuaded a reasonable worker from engaging in protected activity.

86.     Dr. Bolton spoke as a private citizen, and not as a part of her official duties as a public employee when she reported unlawful conduct regarding Defendants illegal employment practices, excessive use of force, anti- and retaliation.

87.     In this matter, Plaintiff's conduct was protected by the First Amendment of the United States Constitution as herein above alleged. This protected conduct was a substantial or motivating factor in the adverse employment actions taken by Defendants. As a result of Dr. Bolton's communication and report regarding the May 11, 2018 incident and other whistleblowing alleged herein, Defendants not only took adverse employment actions, but the workplace abuses and retaliation intensified, thus depriving Dr. Bolton of her First Amendment and Fourteenth Amendment Constitutional Rights. At the time of Plaintiff's protected speech, she was acting as a private citizen and speaking to matters of public concern.

88.     Defendants Newson, Allison and CDCR acting in their official capacity, and Defendant Custodial Staff, acting in their individual capacity, were always acting under color of law herein relevant.

89.     Defendants deprived Dr. Bolton of her rights under the laws of the United States and the United States Constitution as herein set forth.

90.     Defendant Custodial Staff acted pursuant to expressly adopted official policy, a longstanding practice, and/or custom of Defendant Newsom, Allison and CDCR, of retaliating and discriminating against employees who complain against illegal activities and conduct in the workplace. Defendants had retaliated through demotion, termination, harassment, and/or discrimination against other employees before and during the time of Plaintiff's employment. In conformity with this official policy, a longstanding practice, and/or custom, Defendant Custodial Staff intensified their campaign of retaliation against Plaintiff when Plaintiff came forward and reported the use of excessive force that occurred May 11, 2018.

91.     Defendants' adverse employment actions against Dr. Bolton as herein alleged were unprivileged, unlawful, and without a business purpose. Defendants' actions and failures as alleged herein constitute a pattern, practice, and/or custom of violations of the Civil Rights Laws of the United States, 42 U.S.C. §1983. Defendants, while acting under color of state authority and law, wrongfully and intentionally retaliated against Dr. Bolton for her participation in statutorily protected activity.

92.     As a result of the above described conduct of Defendants, and each of them, Dr. Bolton has sustained and will continue to sustain physical, mental and emotional injuries, pain, distress,

suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, mental suffering, shock, humiliation and indignity, as well as other unpleasant physical, mental, and emotional reactions, damages to her good name, reputation, standing in the community, and other non-economic damages. Dr. Bolton's protected conduct was a substantial or motivating factor in any retaliatory acts taken by Defendants.

93.     As a further legal result of the above-described conduct of Defendants, and each of them, Dr. Bolton was and continues to be hindered, prevented, and precluded from performing her usual work activities, causing Plaintiff to sustain damages for the loss of earning capacity and work advancement and/or promotion.

94.      As a further legal result of the above-described conduct of Defendants, and each of them, Dr. Bolton suffered incidental, consequential and special damages in an amount according to proof.

95.     As a further legal result of the above-described conduct, of Defendants, and each of them, Dr. Bolton has and will continue to incur attorney's fees and costs in an amount according to proof.

96.     The conduct of Defendants and their agents and employees as described herein was malicious, oppressive, and done with a willful and conscious disregard for Dr. Bolton's rights and for the deleterious consequences of Defendants' actions. Defendants and their agents and employees or supervisors authorized, condoned, and ratified the unlawful conduct of the remaining Defendants.

97.     Finally, as a direct and proximate result of the aforesaid unlawful acts of the Defendants, and each of them, Dr. Bolton has suffered stress-related health consequences. Dr. Bolton claims general damages for such health problems in an amount to be proven at time of trial.

98.     Wherefore, Plaintiff prays for judgement as more fully set forth below.

### THIRD CLAIM FOR RELIEF
**Retaliation for Exercising Free Speech Monell Action-Based on Act of Final Policymaker in Violation of 42 U.S.C. §1983.**
**(Against Defendants Newsom, Allison, CDCR, Does 1-50)**

99.     Plaintiff incorporates by reference herein each and every paragraph of the complaint as though set forth herein full.

100.     In this matter, Dr. Bolton's conduct was and is protected by the First Amendment of the United States Constitution as herein above alleged. This protected conduct was a substantial or motivating factor in the adverse employment actions taken by Defendants. Upon Dr. Bolton coming

forward with reporting the use of excessive force that occurred on May 11, 2018 by Custody Officer Staff, Defendants not only failed to properly investigate and remedy the unlawful conduct but rather the unlawful conduct, harassment, discrimination, and retaliation became more and more egregious.

101.    Defendants always acted under the color of law herein relevant. A person acts "under color of law" when the person acts or purports to act in the performance of official duties under any state, county, municipal law, ordinance, or regulation.

102.    The acts of Defendants deprived Dr. Bolton of her rights under the laws of the United States and the United States Constitution as herein set forth.

103.    In order to prevail on her §1983 claim against Defendants alleging liability based on the act of a final policymaker, the Plaintiff must prove each of the following elements by a preponderance of the evidence: (1) Defendant Custodial Staff acted under the color of state law; (2) The acts of Defendant Custodial Staff deprived the Plaintiff of her particular rights under the laws of the United States and the United States Constitution; (3) Defendant Custodial Staff had final policymaking authority from Defendant s Newsom, Allison and CDCR, concerning these illegal acts, conduct and behavior; (4) when Defendant Custodial Staff engaged in these acts, he was acting as a final policymaker for Defendant CDCR; and (5) the acts of Defendant Custodial Staff caused the deprivation of the Plaintiff's rights, that is, Defendant Custodial Staff acts were so closely related to the deprivation of the Plaintiff's rights as to be the moving force that caused the ultimate injury.

104.    Defendant Custodial Staff had final policymaking authority as a member of the Custody Officer Staff from Defendant Newsom, Allison and CDCR concerning these acts herein alleged. Defendant Custodial Staff had final policymaking authority since Plaintiff had to ultimately seek redress outside of her employment and retain legal counsel. When Defendant Custodial Staff engaged in these acts, they were acting as a final policymaker for Defendant Newson, Allison and CDCR.

105.    As a legal result of the above described conduct of Defendants, and each of them, Dr. Bolton has sustained and will continue to sustain physical, mental, and emotional injuries, pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, mental suffering, shock, humiliation and indignity, as well as other unpleasant physical, mental, and emotional reactions, damages to her good name, reputation, standing in the community and other non-

economic damages. Dr. Bolton's protected conduct was a substantial or motivating factor in any retaliatory acts taken by Defendants.

106.    As a further legal result of the above-described conduct of Defendants, and each of them, Dr. Bolton has been hindered, prevented, and precluded from usual work activities, causing Plaintiff to sustain damages for the loss of earning capacity and work advancement and/or promotion.

107.    As a further legal result of the above-described conduct of Defendants, and each of them, Dr. Bolton suffered incidental, consequential, and special damages in an amount according to proof.

108.    As a further legal result of the above-described conduct of Defendants, and each of them, Dr. Bolton has and will continue to incur attorney's fees and costs in an amount according to proof.

109.    The conduct of Defendants and their agents and employees as described herein were malicious, oppressive, and done with a willful and conscious disregard for Dr. Bolton's rights and for the deleterious consequences of Defendants' actions. Defendants and their agents and employees or supervisors authorized, condoned and ratified the unlawful conduct of the remaining Defendants.

110.    Finally, as a direct and proximate result of the aforesaid unlawful acts of the Defendants, and each of them, Dr. Bolton has suffered stress-related health consequences. Dr. Bolton claims general damages for such health problems in an amount to be proven at time of trial.

111.    Wherefore, Plaintiff prays for judgement as more fully set forth below.

### FOURTH CLAIM FOR RELIEF
**Retaliation for Exercising Free Speech Monell Action-Based on Ratification
in Violation of 42 U.S.C. §1983
(Against Defendants Newsom, Allison, CDCR, Does 1-50)**

112.    Plaintiff incorporates by reference herein each and every paragraph of the complaint set forth herein full.

114.    Dr. Bolton brings this claim under federal statute 42 U.S.C. §1983, which provides that any person or persons, who, under color of law, deprives another of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the injured party.

115.    In order to prevail on her §1983 claim against Defendants CDCR alleging liability based on ratification by a final policymaker, the Plaintiff must prove each of the following elements by a preponderance of the evidence: (1) Defendants Newsom, Allison and CDCR acted under color of state law; (2) The acts and failure to act of Defendants Newsom, Allison and CDCR deprived the Plaintiff of

her particular rights under the laws of the United States and the United States Constitution, specifically the First and Fourteenth Amendments; (3) Defendant Custodial Staff  and CDCR acted under color of state law; (4) Defendant Custodial Staff had final policymaking authority from Defendants Newsom, Allison and CDCR concerning the acts and failure to act of Defendant Custodial Staff; and (5) Defendants Newsom, Allison and CDCR ratified Defendant Custodial Staff's acts and failure to act, that is, Defendant Newsom, Allison and CDCR knew of and specifically made a deliberate choice to approve Defendant Custodial Staff's acts and failure to act and the basis for it.

116.    To state a claim of retaliation under §1983, a Plaintiff must allege: (1) that her conduct was protected by the Constitution; and (2) that the protected conduct was a substantial or motivating factor in any retaliatory acts taken by the state actor Defendants. *Pankey v. City of Concord*, 6-CV-03737-JCS, 2008 WL 793873, at *9 (N.D. Cal. Mar. 24, 2008) (citing *Berry v. Atkins*, 93-CV-20473-WAI, 1995 WL 691869, at *3 (N.D. Cal. Nov. 15, 1995)).

117.    In this matter, Dr. Bolton's conduct was protected by the First Amendment of the United States Constitution as herein above alleged. This protected conduct was a substantial or motivating factor in the adverse employment actions taken by Defendants. As a result of Dr. Bolton's reporting the May 11, 2018 excessive use of force incident, and ongoing retaliation in the workplace, Defendants not only took adverse employment actions, but the workplace abuses, retaliation and harassment intensified, thus depriving Dr. Bolton of her First and Fourteenth Amendment Constitutional Rights. At the time of Dr. Bolton's protected speech, she was acting as a private citizen and speaking to matters of public concern.

118.    Defendant Newsom, Allison and CDCR, at all relevant times knew, and was informed of Defendant Custodial Staff's illegal employment practices failed to protect Dr. Bolton from such illegal practices of its employees. Defendant CDCR knew and was informed that Defendant Custodial Staff had been harassing, retaliating, and engaging in illegal conduct against Dr. Bolton for engaging in protected activity. Defendant Newsom, Allison and CDCR remained indifferent and steadfast in ignoring its federal and state obligations to create and maintain a safe work environment free of all forms of discrimination and illegal conduct, including retaliation against Dr. Bolton and other staff who reported unlawful conduct, as well as excessive force targeting disabled inmates Defendants Newsom, Allision and CDCR ratified, adopted, and endorsed the illegal conduct of Defendant Custodial Staff.

119.    Defendants Newsom, Allison and CDCR, acting in their official capacity, acted under

color of law at all times herein relevant. A person acts "under color of law" when the person acts or purports to act in the performance of official duties under any state, county, or municipal law, ordinance or regulation.

120.    The acts of Defendants deprived Dr. Bolton of her rights under the laws of the United States and the United States Constitution as herein set forth.

121.    Defendant Custodial Staff had final policymaking authority from Defendants Newsom, Allison and CDCR concerning these acts herein alleged.

122.    When Defendant Custodial Staff engaged in these acts, they were acting as final policymakers for Defendants Newsom, Allison and CDCR.

123.    Defendants, and each of them, and their authorized policymaker superiors, ratified Defendants' acts as herein alleged and the basis for them, that is, Defendants, and each of them, knew of and specifically approved of Defendant Custodial Staff's illegal acts, including excessive force and retaliation.

124.    As a legal result of the above described conduct of Defendants, and each of them, Dr. Bolton has sustained and will continue to sustain physical, mental, and emotional injuries, pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, mental suffering, shock, humiliation, and indignity, as well as other unpleasant physical, mental, and emotional reactions, damages to her good name, reputation, standing in the community and other non-economic damages. Dr. Bolton's protected conduct was a substantial or motivating factor in any retaliatory acts taken by Defendants.

125.    As a further legal result of the above-described conduct of Defendants, and each of them, Dr. Bolton was hindered, prevented, and precluded from performing her usual work activities, causing Plaintiff to sustain damages for the loss of earning capacity and work advancement and/or promotion.

126.    As a further legal result of the above-described conduct of Defendants, and each of them, Dr. Bolton suffered incidental, consequential and special damages in an amount according to proof.

127.    As a further legal result of the above-described conduct of Defendants, and each of them, Dr. Bolton has and will continue to incur attorney's fees and costs in an amount according to proof.

128.    The conduct of Defendants and their agents and employees as described herein was malicious, oppressive, and done with a willful and conscious disregard for Dr. Bolton's rights and for the

deleterious consequences of Defendants' actions. Defendants and their agents and employees or supervisors authorized, condoned, and ratified the unlawful conduct of the remaining Defendants.

129.    Finally, as a direct and proximate result of the aforesaid unlawful acts of Defendants, and each of them, Dr. Bolton has suffered stress-related health consequences. Dr. Bolton claims general damages for such health problems in an amount to be proven at time of trial.

130.    Wherefore, Plaintiff prays for judgement as more fully set forth below.

### FIFTH CLAIM FOR RELIEF
**Retaliation for Exercising Free Speech Monell Action-Based on Policy of Failure to Train or Supervise in Violation of 42 U.S.C. §1983**
**(Against Defendants Newsom, Allison, CDCR, Does 1-50)**

131.    Plaintiff incorporates by reference herein each and every paragraph of the complaint as though set forth herein full.

132.    Dr. Bolton brings this claim under federal statute 42 U.S.C. §1983, which provides that any person or persons, who, under color of law, deprives another of any rights, privileges, or immunities secured by the Constitution or laws of the United States shall be liable to the injured party.

133.    In order to prevail on her §1983 claim against Defendants Newsom, Allison, and CDCR alleging liability based on a policy that fails to prevent violations of law by its failure to train its employees, managers, and supervisors, the Plaintiff must prove each of the following elements by a preponderance of the evidence: (1) the acts and failure to act of Defendant CDCR's employee, Defendant Custodial Staff, deprived the Plaintiff of her First and Fourteenth Amendments rights of the United States Constitution; (2) Defendant CDCR's employee, Defendant Custodial Staff, acted under color of state law; (3) the training policies of Defendant Newsom, Allison and CDCR were not adequate to prevent violations of law by its employees and to train its employees to handle the usual and recurring situations with which they must deal; (4) Defendant Newsom, Allison and CDCR was deliberately indifferent to the substantial risk that its policies were inadequate to prevent violations of law by its employees, known or obvious consequences of its failure to train its employee adequately; and (5) the failure of Defendant Newsom, Allison and CDCR to prevent violations of law by its employees, and to provide adequate training, caused the deprivation of Dr. Bolton's rights by the Defendant Custodial Staff; that is, Defendant Newsom, Allison and CDCR's failure to prevent violations of law by Defendant Custodia Staff, and

failure to train Defendant Custodial Staff is so closely related to the deprivation of Dr. Bolton's right as to be the moving force that caused the ultimate injury and harm.

134.    Defendant Custodial Staff clearly lacked sufficient training to prevent and cease their retaliation against the Plaintiff in the workplace as alleged herein.

135.    Defendant Newsom, Allison, and CDCR showed a deliberate indifference, a conscious disregard of the constitutional rights of its employees, and specifically, Dr. Bolton, in failing to train Defendant Custodial Staff obey the laws of the State of California and the federal laws of the United States, including the United States Constitution. It is highly unlikely Defendant Custodial Staff would have acted with such unbridled acts of retaliation had he been properly trained and supervised. Defendant Custodial Staff conduct inflicted upon Dr. Bolton was vile, despicable, oppressive, vexing, malicious, concerning, toxic, unbecoming of a Custody Officer Staff, and should not be tolerated in a civilized society.

136.    In the instant matter, Dr. Bolton's conduct was protected by the First Amendment of the United States Constitution as herein above alleged. This protected conduct was a substantial or motivating factor in the adverse employment actions taken by Defendants. At the time of Dr. Bolton's protected speech, she was acting as a private citizen and speaking as to matters of public concern.

137.    Defendants always acted under color of law at all times herein relevant. A person acts "under color of law" when the person acts or purports to act in the performance of official duties under any state, county, municipal law, ordinance, or regulation.

138.    The acts of Defendants deprived Plaintiff of her rights under the United States and the United States Constitution as herein set forth.

139.    The training policies of Defendant Newsom, Allison and CDCR were and are not adequate to train or supervise its employees to handle the usual and recurring situations with which they must deal and handle.

140.    Defendant Newsom, Allison and CDCR was deliberately indifferent to the obvious consequences of its failure to train its employees adequately. Defendant Newsom, Allison and CDCR knew that its failure to train or supervise adequately made it highly predictable that its employees would engage in conduct that would deprive persons such as Dr. Bolton of her rights.

141.    The failure of Defendant Newsom, Allison and CDCR to provide adequate training caused the deprivation of Dr. Bolton's rights by Defendants, and each of them; the Defendants' failure to train or supervise is so closely related to the deprivation of Dr. Bolton's rights as to be the moving force that caused the ultimate harm and injury.

142.    As a legal result of the above described conduct of Defendants, and each of them, Dr. Bolton has sustained and will continue to sustain physical, mental, and emotional injuries, pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, mental suffering, shock, humiliation, and indignity, as well as other unpleasant physical, mental, and emotional reactions, damages to his good name, reputation, standing in the community and other non-economic damages. Dr. Bolton's protected conduct was a substantial or motivating factor in any retaliatory acts taken by Defendants.

143.    As a further legal result of the above-described conduct of Defendants, and each of them, Dr. Bolton was hindered, prevented, and precluded from performing usual work activities, causing Plaintiff to sustain damages for the loss of earning capacity and work advancement and/or promotion.

144.    As a further legal result of the above-described conduct of Defendants, and each of them, Dr. Bolton suffered incidental, consequential and special damages in an amount according to proof.

145.    As a further legal result of the above-described conduct of Defendants, and each of them, Dr. Bolton has and will continue to incur attorney's fees and costs in an amount according to proof.

146.    The conduct of Defendants and their agents and employees as described herein was malicious, oppressive, and done with a willful and conscious disregard for Dr. Bolton's rights and for the deleterious consequences of Defendants' actions. Defendants and their agents and employees or supervisors authorized, condoned, and ratified the unlawful conduct of the remaining Defendants.

147.    Finally, as a direct and proximate result of the aforesaid unlawful acts of Defendants, and each of them, Dr. Bolton has suffered stress-related health consequences. Dr. Bolton claims general damages for such health problems in an amount to be proven at time of trial.

148.    Wherefore, Plaintiff prays for judgement as more fully set forth below.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SIXTH CLAIM FOR RELIEF**
**Retaliation in Violation of California Labor Code §1102.5**
**(Against Defendants CDCR, Defendant Custodial Staff and Does 1-50)**

149.    Plaintiff incorporates by reference herein each and every paragraph of the complaint as though set forth herein full.

150.    California Labor Code §1102.5 states:

"(a) An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, or from providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.

(b) An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

151.    At all times herein mentioned, Labor Code §1102.5 was in full force and effect and was binding upon Defendants.

152.    Plaintiff engaged in protected activity as defined under Labor Code §1102.5.

153.    Defendants retaliated against Plaintiff after she engaged in a protected activity pursuant to Labor Code §1102.5. Defendants' retaliation, discrimination, and harassment against Plaintiff violated Labor Code §1102.5.

154.    As a legal result of the above-described conduct of Defendants, and each of them, Plaintiff has sustained and will continue to sustain physical, mental, and emotional injuries, pain, distress, suffering, anguish, fright, nervousness, grief, anxiety, worry, shame, mortification, injured feelings, mental suffering, shock, humiliation, and indignity, as well as other unpleasant physical, mental and emotional reactions, damages to her good name, reputation, standing in the community and other non-economic damages.

155.    As a further legal result of the above-described conduct of Defendants, and each of them, Plaintiff was hindered, prevented, and precluded from performing usual work activities, causing Plaintiff to sustain damages for loss of professional opportunities, work experience, and/or employment opportunities and advancement in an amount according to proof at trial.

156.    As a further legal result of the above-described conduct of Defendants, and each of them, Dr. Bolton suffered incidental, consequential, and special damages in an amount according to proof.

157.    As a further legal result of the above-described conduct of Defendants, and each of them, Dr. Bolton has and will continue to incur attorney's fees and cost in an amount according to proof.

158.    The conduct of Defendants and their agents and employees as described herein was malicious, oppressive, and done with a willful and conscious disregard Plaintiff's rights and for the deleterious consequences of Defendants' actions. Defendants and their agents and employees or supervisors authorized, condoned, and ratified the unlawful conduct of the other Defendants.

159.    Defendants' acts as alleged herein were intentional, outrageous, despicable, oppressive, fraudulent, and done with ill will and intent to injure Dr. Bolton and to cause her mental anguish, anxiety, and distress. Defendants' acts were done in conscious disregard of the risk of severe emotional harm to Dr. Bolton and with the intent to injure, constitution oppression, fraud, and malice, entitling Dr. Bolton to punitive damages against Defendant Custodial Staff. Dr. Bolton's protected conduct was a substantial or motivating factor in any retaliatory acts taken by Defendant CDCR.

160.     Finally, as a direct and proximate result of the aforesaid unlawful acts of Defendants, and each of them, Plaintiff has suffered stress-related health consequences. Plaintiff claims general damages for such health issues in an amount proven at time of trial.

161.     Wherefore, Plaintiff prays judgement as more fully set forth below.

## SEVENTH CLAIM FOR RELIEF
### Negligent Hiring, Retention and Supervision
### (By Plaintiff Against Defendant CDCR, Does 1-50)

162.     By this reference, Plaintiff hereby incorporate paragraphs 1 through xx of this Complaint as if they were set forth within this cause of action.  PLAINTIFF also incorporates into this cause of action each and every allegation set forth in every paragraph of this Complaint, except those that are inconsistent with a cause of action for negligent hiring, retention and supervision.

163.     At all times relevant herein, the CDCR knew or reasonably should have known that the retaliatory conduct, acts and omission of all other Defendants, and of other employees, as described elsewhere in this Complaint and incorporated by reference into this cause of action, violated Plaintiff's rights under federal and state statutes, and that said Defendants and other employees of CDCR engaged in the unlawful behavior as described herein above.

164.     The CDCR knew or should have known Defendant Custodial Staff were unfit for their positions because of their unlawful conduct.  The CDCR knew or should have known that Defendant Custodial Staff required supervision and/or discipline, including but not limited to termination of employment and potentially criminal prosecution, to curb Defendant Custodial Staff unlawful conduct. Plaintiff asserts this cause of action against the CDCR based on vicarious liability, not direct liability.

165.     At all times relevant herein, said Defendants and each of them, knew, or in the exercise of reasonable care should have known, that unless they intervened to protect Plaintiff, and adequately supervised, prohibited, controlled, regulated, disciplined and/or otherwise penalized the improper conduct, acts and omission of the offending employee as described herein, Defendants' failure to so protect, supervise and intervene would have the effect of encouraging, ratifying, condoning, exacerbating, worsening and continuing said conduct, acts and failures to act, thereby subjecting Plaintiff to personal injury and emotional distress.

166.    At all times relevant herein, Defendants, and each of them, had the power, ability, authority, and duty to so intervene, supervise, prohibit, control, regulate, discipline and/or penalize the conduct of all other Defendants and/or offending supervisors, agents, or employees as described herein above.

167.    Despite said knowledge, power and duty, Defendants, and each of them, negligently failed to act to prevent, supervise, prohibit, control, regulate, discipline, and/or penalize the offending conduct described above, or to otherwise protect Plaintiff from such conduct.

168.    As a direct and proximate result of the negligent hiring, retention, and supervision of Defendant Custodial Staff and other employees named herein, and each of them, as described above, Plaintiff has suffered and will continue to suffer embarrassment, humiliation, mental anguish and severe emotional and physical distress.

169.    As a direct and proximate result of the negligent hiring, retention, and supervision of Defendant Custodial Staff, and other employees named herein, and each of them, as described above, Plaintiff has and will continue to incur expenses, loss of deferred compensation, loss of equity, benefits, earning capacity, wages, opportunities for employment and advancement, and work experience, all to her damage in an amount according to proof.

170.    Plaintiff is informed and believes and thereon alleges that the conduct of Defendants CDCR and   DOES 1-50 was grossly intentional, negligently reckless, willful, wanton, malicious, oppressive and/or unmindful of obligations to the Plaintiff and/or exhibits that entire want of care which would rise to the presumption of conscious indifference to the consequences so as to warrant the imposition of punitive damages in an amount sufficient to punish, penalize or deter, for which Defendant Does 1-50 are all liable to Plaintiff. . While the conduct of Defendant CDCR was also grossly intentional, negligently reckless, willful, wanton, malicious, oppressive and/or unmindful of obligations to the Plaintiff and/or exhibits that entire want of care which would rise to the presumption of conscious indifference to the consequences, Plaintiff does not seek punitive damages against Defendant CDCR, given that punitive damages, by law, are not available against a public entity of the State of California.

**WHEREFORE**, Plaintiff prays for judgment against Defendants as set forth below.

### EIGHTH CLAIM FOR RELIEF
**Intentional Infliction of Emotional Distress**
**(Against Defendant CDCR, Defendant Custodial Staff and Does 1-50)**

171.   Plaintiff incorporates by reference all the factual allegations set forth in this complaint except those inconsistent with this cause of action.

172.   Defendants, and each of them, intentionally and maliciously engaged in extreme and outrageous conduct studiously designed to inflict maximum humiliation, shame, mental and severe emotional distress on Dr. Bolton. Defendants' conduct is not and should not be tolerated in a civilized society.

173.   Defendants' conduct caused Dr. Bolton pain, anxiety, inconvenience, mental distress, severe emotional distress, loss of enjoyment of life, damage to career, damage to self-image, misery, and other non-economic damages including suffering.

174.   While the conduct of Defendant CDCR was also grossly intentional, negligently reckless, willful, wanton, malicious, oppressive and/or unmindful of obligations to the Plaintiff and/or exhibits that entire want of care which would rise to the presumption of conscious indifference to the consequences, Plaintiff does not seek punitive damages against DEFENDANT CDCR, given that punitive damages, by law, are not available against a public entity of the State of California.

175.   Wherefore, Plaintiff prays for judgement against Defendants as set forth below.

### NINTH CLAIM FOR RELIEF
**Negligent Infliction of Emotional Distress**
**(Against Defendant CDCR, Defendant Custodial Staff and Does 1-50)**

176.   Plaintiff incorporates by reference all the factual allegations set forth in this complaint except those inconsistent with this cause of action.

177.   By engaging in the conduct set forth herein, Defendants have negligently breached their duty of care not to engage in the conduct alleged. Plaintiff asserts this cause of action against Defendant CDCR based on vicarious liability, not direct liability.

178.   Plaintiff has suffered and continues to suffer discomfort, anxiety, humiliation, and emotional distress, and will continue to suffer serious emotional distress in the future in an amount according to proof.

179.    Defendants' negligence was a substantial factor in causing Plaintiff's serious emotional distress.

180.    Plaintiff is informed and believes that the wrongful acts and/or conduct alleged herein which was perpetrated by all Defendants was done maliciously, oppressively, and/or fraudulently and with a wrongful intent of harming and injuring Plaintiff and did in fact harm Plaintiff with an improper and evil motive amounting to malice and in conscious disregard of Plaintiff's rights. As a result, Plaintiff is entitled to recover punitive damages. While the conduct of Defendant CDCR was also grossly intentional, negligently reckless, willful, wanton, malicious, oppressive and/or unmindful of obligations to the Plaintiff and/or exhibits that entire want of care which would rise to the presumption of conscious indifference to the consequences, Plaintiff does not seek punitive damages against Defendant CDCR, given that punitive damages, by law, are not available against a public entity of the State of California.

181.    Wherefore, Plaintiff prays for judgement against Defendants as set forth below.

## INJUNCTIVE RELIEF

1.    Plaintiff incorporates by reference each allegation contained in the preceding paragraphs as though fully stated here.

2.    Plaintiff seeks injunctive relief.

3.    No previous application for injunctive relief sought herein has been made to this Court.

4.    If this Court does not grant the injunctive relief sought herein, Plaintiff will be irreparably harmed.

5.    No plain, adequate, or complete remedy at law is available to Plaintiff to redress the wrongs addressed herein.

## DECLARATORY RELIEF

6.    Plaintiff incorporates by reference each allegation contained in the preceding paragraphs as though fully stated here.

7.    An actual controversy has arisen and now exists relating to the rights and duties of the parties herein in that Plaintiff contend that Defendants violated her rights not to be subjected to discrimination and retaliation. Defendants deny these allegations. Declaratory relief is therefore necessary and appropriate.

8.      Plaintiff seeks a judicial declaration of the rights and duties of the respective parties.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.      That process be issued and served as provided by law, requiring Defendants to appear and answer or face judgment;

2.      That Plaintiff has and recovers a judgment against Defendants in an amount to be determined at trial as general, special, actual, compensatory and/or nominal damages;

3.      For declaratory judgment that the practices complained of in this complaint are unlawful;

4.      For injunctive relief;

5.      For Plaintiff's attorneys' fees and costs;

6.      That Plaintiff has and recovers a judgment against Defendants Custodial Staff, and Does 1-50 for punitive damages in an amount to be determined at trial sufficient to punish, penalize and/or deter Defendant Custodial Staff and Does 1-50;

7.      For payment of interest at the legal rate on such damages as appropriate, including pre- and post- judgment interest;

8.      Any other relief as allowed by law; and

9.      For any further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of each and every cause of action so triable.

DATED:                                   Respectfully submitted,


                                         By:     /S/ Wendy Musell


                                         WENDY MUSELL
                                         The Law Offices of Wendy Musell

                                         Attorneys for Plaintiff
                                         Jessica Bolton